OFFIT KURMAN, P.A.
By:     Zachary Glaser, Esquire
          N.J. I.D.: 034192000
Ten Penn Center
1801 Market Street, Suite 2300
Philadelphia, PA 19103
(267) 319-1300
(267) 338-1335 (fax)
zglaser@offitkurman.com                    *Attorneys for Plaintiff*


## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY - CAMDEN DIVISION

| | |
|---|---|
| AMERICAN NEIGHBORHOOD MORTGAGE | : |
| ACCEPTANCE COMPANY, LLC | : |
| d/b/a ANNIEMAC HOME MORTGAGE, | : |
| 700 East Gate Drive | : |
| Mount Laurel, NJ 08054 | : |
| | : Civil Action No. 19-cv-03666-NLH-JS |
| Plaintiff, | : |
| v. | : Judge Noel L. Hillman |
| | : |
| JOSHUA LUND | : |
| 11736 Meadow Run Circle | : |
| Fort Myers, FL 33913 | : |
| | : |
| and | : |
| | : |
| MATTHEW BENSON | : |
| 13 4th Avenue N. | : |
| #102 | : |
| Minneapolis, MN 55401 | : |
| | : |
| and | : |
| | : |
| JAMES SCHAEFER | : |
| 5110 Trenton Lane N. | : |
| Plymouth, MN 55442 | : |
| | : |
| and | : |
| | : |
| MARK TRUDEAU | : |
| 6434 City West Parkway | : |
| Eden Prairie, MN 55344 | : |
| | : |

and                                              :
                                                 :
GOLD STAR MORTGAGE FINANCIAL                     :
CORPORATION                                      :
c/o Registered Agent                             :
40600 Ann Arbor Rd.                              : **SECOND AMENDED COMPLAINT**
E Suite 201                                      : **AND DEMAND FOR JURY TRIAL**
Plymouth, MI 48170                               :
                                                 :
                        Defendants.              :

Plaintiff, American Neighborhood Mortgage Acceptance Company, LLC d/b/a AnnieMac Home Mortgage ("AnnieMac"), by its undersigned counsel, hereby files this Second Amended Complaint seeking monetary damages, injunctive relief, and all other such relief as the Court deems appropriate, against Defendants Joshua Lund, Matthew Benson, James Schaefer, Mark Trudeau (collectively "Employee Defendants"), and Gold Star Mortgage Financial Group Corporation ("Gold Star"), for violations of the Defend Trade Secrets Act, misappropriation of trade secrets under federal and state law, and breaches of contract and fiduciary duties.

## Parties

1.     At all times relevant herein, AnnieMac was and is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business located at 700 East Gate Drive, Suite 400, Mt Laurel, New Jersey 08054.

2.     AnnieMac was and is a citizen of the State of New Jersey because its two members, Joseph Panebianco and Matthew Buckley are both residents and citizens of the State of New Jersey.

3.     At all times relevant herein, Lund was and is an individual residing at 11736 Meadow Run Circle, Fort Myers, Florida, and was and is a citizen of the State of Florida.

4.     Mr. Lund was previously employed by AnnieMac as a Branch Manager for the company's Minneapolis, Minnesota branch office.  Upon information and belief, Mr. Lund is currently employed by Gold Star.

5.     Matthew Benson is a citizen and resident of the State of Minnesota with a residence at 13 4th Avenue N. #102, Minneapolis, MN 55401.

6.      Mr. Benson was previously employed by AnnieMac as Mortgage Loan Originator and worked out of the company's Minneapolis, Minnesota branch office.  Upon Information and belief, Mr. Benson is currently employed in a similar position with Gold Star.

7.     James Schaefer is a citizen and resident of the State of Minnesota with a residence at 5110 Trenton Lane N, Plymouth, MN 55442.

8.     Mr. Schaefer was previously employed by AnnieMac as Mortgage Loan Originator and worked out of the company's Minneapolis, Minnesota branch office.  Upon Information and belief, Mr. Schaefer is currently employed in a similar position with Gold Star.

9.     Mark Trudeau is a citizen and resident of the State of Minnesota with a residence at 6434 City West Parkway, Eden Prairie, MN 55344.

10.     Mr. Trudeau was previously employed by AnnieMac as Mortgage Loan Originator and worked out of the company's Minneapolis, Minnesota branch office.  Upon Information and belief, Mr. Trudeau is currently employed in a similar position with Gold Star.

11.     Gold Star Mortgage Financial Group Corporation ("Gold Star") is a Michigan corporation with its principal place of business located at 100 Phoenix Drive, Suite 300, Ann Arbor, MI 48108.

12.     Gold Star is in the business of originating residential mortgages and is a competitor of AnnieMac. Gold Star is licensed to do business in the State of New Jersey and has been issued a banking license by the jurisdiction.

13.     Gold Star is residential mortgage lender that does business throughout the country and is a competitor of AnnieMac.

14.     Gold Star is registered to do business in the state of New Jersey and is licensed to extend loans within the jurisdiction as well.

15.     Gold Star is also licensed with the New Jersey Department of Banking and Insurance.

16.     On its website, Gold Star holds itself out to the public as being able to transact business in the State of New Jersey.

17.     Gold Star has previously maintained offices within the state of New Jersey including offices at 309 Fellowship Road, Suite 200, Mt. Laurel, 08054, NJ and 656 Hamilton Street, Somerset, NJ, 8873.

18.     Gold Star presently has a branch that is registered with the Nationwide Multistate Licensing System & Registry, which is located at 135 Brookside Way, Mullica Hill, NJ 08062.

19.     Gold Star employed the Employee Defendants prior to their respective employments with AnnieMac.  Upon information and belief, Gold Star presently employs each of the Employee Defendants.

### Jurisdiction and Venue

20.     Jurisdiction is appropriate in this Court pursuant to 28 U.S.C. §§ 1331 and 1367 as the claims arise under the laws of the United States.

4

21.     In the alternative, jurisdiction is appropriate in this Court pursuant to 28 U.S.C. § 1332 as the amount in controversy exceeds $75,000 and the citizenship of Defendants is diverse from that of the Plaintiff.

22.     The Court has personal jurisdiction over the Employee Defendants because, as set forth in more detail herein, they have each engaged in conduct that is purposely directed at this jurisdiction with the purpose of causing an injury to a citizen of New Jersey.  Such conduct was conducted with actual and/or constructive knowledge that the injury caused would be suffered within this jurisdiction.

23.     This Court has personal jurisdiction over Gold Star because it has purposely availed itself of this jurisdiction.  As set forth in more detail herein, Gold Star is corporation that is registered with the State of New Jersey and holds a banking license with the state.  It has also periodically operated offices within the jurisdiction and, upon information and belief, presently maintains employees within the state.

24.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391.

## Factual Allegations Common to All Counts

25.     AnnieMac is a residential mortgage company that does business throughout the United States.  While the company is based out of Mount Laurel, New Jersey, it has branch offices nationwide.

26.     AnnieMac is an approved seller/servicer with Fannie Mae, Freddie Mac, and Ginnie Mac, and as a result, the company has access to the best mortgage programs that are available and is able to provide conventional, government, and non-conforming mortgages.

27.     In furtherance of its business, AnnieMac invests substantial time, money, and resources, to develop its brand and to market itself to potential borrowers.  It has taken AnnieMac years to build up the reputation and client base that the company uses to generate revenue.

28.     In particular, AnnieMac invests time, money, and resources to provide exceptional service to each and every borrower that the company is in contact with.  In doing so, AnnieMac's employees spend time getting to know the particular customer and to understand their personal and financial circumstances.  This allows AnnieMac to provide the customer with a home loan that fits the customer's specific needs.  Through this process, AnnieMac cultivates close customer relationships and obtains information about its customers that is private, non-public, and personal in nature.  This information allows AnnieMac to assess the customer's immediate financial needs and also allows AnnieMac to anticipate the customer's future financial needs as well.  The ability of a competitor to use the customer information that has been cultivated by AnnieMac (defined below as "Confidential Materials") to generate new revenue for their own company would severely and irreparably harm AnnieMac's business.

29.     Once a customer agrees to do business with AnnieMac, the company dedicates extensive resources to ensure that its loan originators are able to meet and exceed the expectations of the customer.  AnnieMac provides each loan originator with the resources to ensure that they have an in-depth understanding of each customer's needs and to assist the customer through the process of obtaining a loan.  One way in which AnnieMac develops its customer relationships is through doing all of its loan underwriting in house.  This allows AnnieMac to be more transparent and responsive to customer inquiries while a home loan is under consideration.  The ability to closely and transparently walk a customer through the process of obtaining a home loan helps the

6

company develop goodwill and trust with the customer, which is also attributed to AnnieMac's loan originators.

30.     Moreover, AnnieMac recognizes that its exceptional customer service results in customers returning to do subsequent transactions.  As a result, the company encourages its employees, particularly its customer interfacing employees, to develop relationships with its customers to help ensure that they do additional business with the company.

### AnnieMac's Minneapolis Office

31.     On or about December 29, 2017, AnnieMac hired Mr. Lund as the branch manager for the company's Minneapolis branch office.

32.     At or around the same time, AnnieMac also hired Messrs. Benson, Trudeau, and Schaefer as Mortgage Loan Originators.

33.     As Mortgage Loan Originators, Messrs. Benson, Trudeau, and Schaefer were required to have extensive customer interaction and where required to cultivate and develop business on behalf of AnnieMac.  The role of Mortgage Loan Originator required Messrs. Benson, Trudeau, and Schaefer to have access to confidential and proprietary information about AnnieMac's customers.

34.     Mr. Lund, as branch manager had similar access to customers and confidential and proprietary information.

35.     Each of the Employee Defendants executed an employment agreement in connection with their respective employment.  These agreements set forth the terms and conditions of the Employee Defendants' respective employment and contained restrictions on their post-employment activity.

36.    The Employment Agreement that was executed by each of the Employee Defendants clearly identifies that AnnieMac is a New Jersey company, and it could be clearly inferred that any injury resulting from a breach of employment agreement would be felt in the state of New Jersey.

37.    Upon starting, the Employee Defendants received AnnieMac's Employee Handbook, which expressly states that client information is confidential and proprietary, and that it cannot be disclosed without express permission from the Company, nor is any employee permitted to copy or remove such information.

38.    This policy is aligned with the Gramm Leach Bliley Act, as well as federal and state trade secret laws, which prohibit the transfer of consumer nonpublic information without express consent and the unauthorized taking of a business's confidential information.

39.    The Employee Handbook further identifies that AnnieMac is a New Jersey company and that its principal place of business is within the state.

40.    Some or all of the Employee Defendants were required to travel to New Jersey during their employment for training or other company events.

41.    As described in more detail below, the Employee Defendants each breached the obligations set forth in their respective employment agreements and such conduct also violated the Defendants common law obligations to AnnieMac and state and federal statutes.

### Joshua Lund

42.    Mr. Lund was hired by AnnieMac on December 29, 2017 as a Branch Manager for the Minneapolis branch.

43.    On December 29, 2017, Mr. Lund entered into the Branch Manager Employment Agreement ("Lund Agreement") with AnnieMac, a copy of which is attached hereto as **Exhibit 1.**

8

44.     As a material term of the Lund Agreement, Mr. Lund warranted that he was not involved in any other real estate business during the term of his employment. Ex. 1 at § 1.3.  This representation was essential to AnnieMac's decision to employ Mr. Lund.  *Id.*

45.     Mr. Lund further agreed to comply with all regulations and policies of AnnieMac, and agreed that he "is subject to and will strictly follow all policies and procedures adopted by Employer…." Ex. 1 at § 2.9(C).  Mr. Lund also "acknowledge[d] having received a copy of [AnnieMac's] written policies and procedures" and agreed that such procedures were incorporated as part of the Lund Agreement.

46.     The Lund Agreement further contains a non-exhaustive list of what constitutes AnnieMac's confidential and proprietary materials ("Confidential Materials"), and defines such materials as:

> forms, procedures, files, records, documents, correspondence, notes, business card files, memoranda, pricing and marketing information, trade secrets, vendor and affiliate information, financial information concerning Employer and its affiliates, computer records, reports, customer (including current, former and prospective customer) lists, printouts, manuals, computer equipment and software, pagers, telephone cards, keys, security cards and other entry devices for access to Employer's facilities or those of Employer's affiliates, and other documents (and all copies thereof) and similar items relating to the business of Employer which are owned by Employer and which are regularly used in the operation of the business of Employer.

Ex. 1 at § 4.1.

47.     The Lund Agreement goes on to place the following restriction on the use of Confidential Information:

> Employee shall not disclose any Confidential Materials or use such material in any way during the term of this Agreement, except as required in the normal course of Employee's employment, and at no time thereafter. All Confidential Materials shall remain the exclusive property of Employer and shall not be copied or reproduced by Employee, in whole or in part, or removed from the premises of Employer under any circumstances whatsoever without the prior written consent of the Employer, except as required in the normal course of Employee's employment hereunder.  At

all times hereafter, Employee will not, except with Employer's express prior written consent, directly or indirectly, provide, communicate, disclose or divulge to any individual, sole proprietorship, joint venture, partnership, corporation, association or any other governmental or non-governmental entity or authority (collectively "Person"), or use for his/her own benefit or the benefit of any Person, any Confidential Materials, no matter when or how acquired, except for information which: (1) is in the public domain without violation of this Agreement or applicable law; or (2) the disclosure of which is required by applicable law.   Employee acknowledges the proprietary nature of the Confidential Materials and understands that the Confidential Materials must be maintained in strict confidence in order for Employer to protect its business and its competitive position in the marketplace.

Ex. 1 at § 4.1.

48. As a material term of his employment, Mr. Lund agreed that:

During the term of Employee's employment and upon termination of employment by Employee or Employer, and for a period of one (1) year thereafter or such longer period provided for under applicable law, Employee expressly covenants and agrees that Employee shall not, either directly or indirectly…(3) contact or solicit any of the Employer's customers or prospective customers (unless such customer were learned of through the Employee or branch staff self-generated referral sources and applicable Laws expressly permit such contact and/or solicitation). Employee acknowledges that each, every, and any and all prospective borrowers with which Employee comes into contact during the term hereof, whether by referral, direct origination, or marketing, warrants that during the term of this Agreement, Employee shall not introduce any such prospective borrowers(s) to any mortgage service provider other than Employer nor to vendors offering the types of services or products offered by Employer's affiliates, other than Employer's affiliates, except as otherwise required under applicable Laws.

Ex. 1 at § 4.4.

49.     Mr. Lund acknowledged that any breach of the Lund Agreement would result in irreparable harm to AnnieMac.  Ex. 1 at § 5.2.

50.     In addition, on or about February 22, 2018, AnnieMac issued, and Mr. Lund accepted, a Revised Offer Letter, which amended the terms of Mr. Lund's compensation.  A true and accurate copy of the Revised Offer Letter is attached hereto as **Exhibit 2**.

51.     Pursuant to the terms of the Revised Offer Letter, Mr. Lund was eligible to receive a Retention Bonus as consideration for remaining employed by AnnieMac through the following dates:

| PAY DATE | RETENTION BONUS AMOUNT |
|---|---|
| January 25, 2018 | $38,000.00 |
| February 9, 2018 | $1,500.00 |
| February 23, 2018 | $21,500.00 |
| March 9, 2018 | $11,500.00 |
| March 23, 2018 | $11,500.00 |
| April 10, 2018 | $11,500.00 |
| April 25, 2018 | $11,500.00 |
| May 10, 2018 | $11,500.00 |
| May 25, 2018 | $11,500.00 |
| June 8, 2018 | $11,500.00 |
| June 25, 28 | $11,500.00 |
| TOTAL | $153,000.00 |

52. The Revised Offer Letter further provided that:

In the event that you voluntarily terminate your employment with [AnnieMac] or your employment with [AnnieMac] is terminated for cause at any point prior to the expiration of twelve (12) months following receipt of Rentention Bonus, you agree that you will be responsible for reimbursing [AnnieMac] for the entire amount of any Retention Bonus paid to you.  Any repayment amount due shall become due and payable to [AnnieMac] immediately upon demand.

Ex. 2 at p. 2

53.     The Revised Offer Letter further provides that, "[s]hould it becomes necessary for [AnnieMac] to collect any payment due, [Mr. Lund] agree[s] to reimburse [AnnieMac] for all reasonable costs of collection and/or litigation, including necessary and reasonable attorneys' fees." *Id.*

54.     AnnieMac did pay Mr. Lund the full amount of the Retention Bonus.

55.     On or about September 22, 2018 Mr. Lund informed AnnieMac that effective September 28, 2018 he would be resigning his position and begin working for Gold Star.

56.     Gold Star is another residential mortgage company that offers services that are similar to the services that are offered by AnnieMac.  As a result. Gold Star is considered a competitor of AnnieMac.

57.     During the term of his employment, Mr. Lund held an ownership interest in a real estate company known as "Lund Realty, Inc." with his wife, Danielle Lund.  Mr. Lund's involvement with this company violated the terms of the Lund Agreement.

58.     Upon information and belief, in the summer of 2018, prior to informing AnnieMac about his intention to resign his position, Mr. Lund decided to move from AnnieMac to Gold Star. In doing so, he recruited Messrs. Benson, Trudeau, and Schaefer, to join him in changing companies and planned with the aforementioned to bring AnnieMac customers to Gold Star once the Employee Defendants defected.

59.     Upon information and belief, Gold Star was aware that the Employee Defendants were planning to attempt to bring AnnieMac customers and Confidential Materials with them once they switched companies.

60.     Upon information and belief, Gold Star knew, or expected, that the Employee Defendants would target AnnieMac customers and potential customers once they became Gold

Star employees.  Further, upon information and belief, Gold Star expected that the Employee Defendants would bring AnnieMac's Confidential Materials with them when they became employees.

61.   In furtherance of his plan with the other Employee Defendants and Gold Star, Mr. Lund began assembling Confidential Materials and contacting AnnieMac customers to provide them with his new contact information.  Upon information and belief, each of these instances (set forth in more detail below) was an attempt to divert actual or potential AnnieMac customers, as well as an attempt to misappropriate Annie Mac's Confidential Materials.

62.   On or about September 4, 2018, Mr. Lund emailed a customer list, which contained customer loan information, from his AnnieMac email account to his personal email account.

63.   On or about September 14, 2018, Mr. Lund emailed Faith and Don Crump, two AnnieMac customers.  In doing so, Mr. Lund informed Mr. and Mrs. Crump that he was leaving AnnieMac and requested that they communicate with his personal email account going forward. Mr. Lund assured Mr. and Mrs. Crump that nothing would change as a result of his departure from AnnieMac.

64.   That same day, Mr. Lund had a similar exchange with another customer named Wally Wysopal.  In that exchange, Mr. Lund instructed Mr. Wysopal to send his financial documents to Mr. Lund's personal email account rather than his AnnieMac email account.  Upon information and belief, Mr. Lund's conduct was done for the purposes of taking Mr. Wysopal's business with him when he made the switch to Gold Star.

65.   On or about September 18, 2018, Mr. Lund contact Megan Delvo, an AnnieMac customer who had been in actual discussions about a loan several weeks prior.  The following day, Mr. Lund exchanged emails with Ms. Delvo concerning her financial situation.  Mr. Lund

instructed Ms. Delvo to communicate with his "personal email" going forward, in an attempt to transition her business to Gold Star once he officially switched companies.

66.     On or about September 26, 2018, Mr. Lund again responded to an email inquiry from Ms. Delvo by stating "You are on the list. I promise, not blowing you off. Also, this email wont work as of Friday. Use my personal email. Josh@ameccorp.net or my new email for business in jlund@goldstarfinancial.com. We are back to Gold Star as of Monday." Two days later, Mr. Lund again instructed Ms. Delvo to "Use my personal email from here on out. This email wont [*sic*] work after today."

67.     On or about September 19, 2018, Mr. Lund was contact by a real estate agent named Cheri Follese concerning a residential property purchase that required financing. The following day, Mr. Lund contacted to Ms. Follese to inform her that "[w]e are working on this loan application and will get this all completed asap." He went on to inform Ms. Follese that "[w]e are in the transition back to Gold Star Mortgage as we speak. I have cc'd my personal email in the time being." This email exchange was clear attempt to divert this particular customer to Gold Star.

68.     On or about September 28, 2018, Mr. Lund exchanged emails with a Kevin Strong. These emails contained the subject line "closing." In this email exchange, Mr. Lund instructed Mr. Strong to send future emails to his personal email account.

69.     Mr. Lund contacted AnnieMac customers and provided them with his personal email address for the purposes of diverting their current and future business to his new employer, Gold Star. Such conduct is a direct violation of the Lund Agreement.

70.     Mr. Lund emailed himself Confidential Materials including a customer list and financial information for the purposes of soliciting AnnieMac customers in violation of the Lund Agreement and his common law, fiduciary, and statutory obligations.

**Matthew Benson**

71.    Matthew Benson was hired by AnnieMac as an Mortgage Loan Originator on or about December 28, 2017.  In furtherance of obtaining employment with AnnieMac, Mr. Benson executed an offer letter that indicates that AnnieMac is a New Jersey company.

72.    As a condition of his employment with AnnieMac, Mr. Benson signed the American Neighborhood Mortgage Acceptance Company LLC Loan Originator Agreement ("Loan Originator Agreement"), a copy of which is attached hereto as **Exhibit 3**.

73.    The Loan Originator Agreement expressly states that AnnieMac's principal place of business is located within the state of New Jersey.

74.    Under the Loan Originator Agreement, Mr. Benson agreed that he "shall not solicit mortgage loans for any other person during the term of this Agreement." Ex. 3 at § 1(b).

75.    Section 7(a) of the Employment Agreement states:

During the term of this Agreement, the Loan Originator shall devote his best efforts to the performance of his duties under this Agreement and to advance the interests of the Company. In doing so, he shall avoid any actual or apparent conflicts of interest and shall not directly or indirectly engage in any business which may compete with Company, nor shall a Loan Originator have any ownership interest in any such competing business, without the written consent of the Company…. Loan Originator must devote all time during normal business hours to Company.

Ex. 3 at § 7(a).

76.    In addition, Sections 7(b) and (c) state:

(b)    Loan Originator shall follow all confidentiality policies as defined in the Company's Employee Handbook and Consumer Privacy Policy. Loan Originator shall not utilize confidential or proprietary information of any kind, including but not limited to, customer lists, procedures, information on computer diskettes, information electronically stored on computer hard press, data bases, or other information of any person other than the Company and shall return all materials provided to him by the Company or any present, past or potential customer of Company upon cessation of his engagement; and

15

(c)     Loan Originator will not, in any way, (i) induce or attempt to induce any Loan Originator to resign his employ with the Company; (ii) interfere with or disrupt the Company's relationship with Loan Originators or customers; and/or (iii) solicit for employment for his own interest of that of any person or entity any person employed by the Company.

Ex. 3, §§ 7(b) and (c).

77.     Thus, the Company's confidentiality policy became an enforceable agreement through the Employment Agreement and Mr. Benson explicitly agreed to a duty of loyalty to AnnieMac.

78.     The Loan Originator Agreement also contains restrictions on Mr. Bensons post-employment activity, by expressly imposing the following non-solicitation restrictions on Mr. Benson:

(a) During the term of this Agreement and for a period of one (1) year after its expiration or termination, the Loan Originator shall not contact, solicit, raid, entice or induce, or attempt to contact, solicit, raid, entice or induce any employee, customer or client of Company to be engaged by, or conduct business with any person, firm, or entity which is, whether directly or indirectly, in competition with the business of Company or any affiliate of Company as it may then be conducted.  In addition, Loan Originator shall not authorize or knowingly approve the taking of any such actions by any other third party.  The restrictions imposed upon the Loan Originator under this Section 14(a) shall be known as the "*Non-Solicitation Restrictions.*"

(b) The Ethical Obligations contained in Section 7, and Non-Solicitation Restrictions contained in this Section 14, shall be collectively known as the "*Restrictive Covenants.*"  The period of time during which any covenant or restriction are imposed on the Loan Originator under this Agreement shall be extended by any length of time during which the Loan Originator is in breach of any such covenant and/or restriction.

(c) Loan Originator acknowledges and agrees that: (i) the Loan Originator's receipt of consideration and commissions under Agreement constitutes fair and adequate consideration for the Restrictive Covenants; (ii) Company will suffer irreparable harm if the Loan Originator breaches the Restrictive Covenants; (iii) the Restrictive Covenants are reasonable as to the subject matter, territorial scope, duration and imposes no undue hardship on the Loan Originator; and (iv)

16

>Company would not have entered into this Agreement with the Loan Originator
>without the Loan Originator's agreement to the Restrictive Covenants.

Ex. 3, at § 14(a)-(c).

79.     On or about September 28, 2018, Mr. Benson resigned his position with AnnieMac to immediately accept an identical position with Gold Star.

80.     Prior to informing AnnieMac if his intent to resign, Mr. Benson entered into an Agreement with the other Employee Defendants to divert AnnieMac customers to Gold Star.  Upon information and belief, Gold Star was aware of the pact between the Employee Defendants and promoted or otherwise encouraged the Employee Defendants conduct.

81.     In preparation for his resignation from the AnnieMac, and in furtherance of his agreement with the other Employee Defendants, Mr. Benson took steps to email himself customer information including specific contact and financial information.

82.     On September 28, 2018, Mr. Benson used his AnnieMac email account to send customer information to his personal email account about the following customers or potential customers of AnnieMac: Katie Wondra, Ashley Bruha, Matt Jordahl, Ken Scott, Dana Hallstrom, Shaun Sullivan, Jenni Wilken, and Jordan Backstrom.

83.     Many of the emails that Mr. Benson sent to his personal email account on September 28, 2018 contained personal financial information about the customers listed in paragraph 76.

84.     On or about October 1, 2018, Mr. Benson began his position as loan originator at Gold Star.

85.     Upon information and belief, Mr. Benson sent this information to his personal email account for use at his job with Gold Star, and he intended to utilize the information to assist in

diverting these customers from AnnieMac to Gold Star, in violation of his contractual, common law, and statutory duties.

### Mark Trudeau

86.　Mark Trudeau was hired by AnnieMac as an Mortgage Loan Originator on or about December 29, 2017.

87.　As a condition of his employment with AnnieMac, Mr. Trudeau signed the Loan Originator Agreement, a copy of which is attached hereto as **Exhibit 4**.

88.　The Loan Originator Agreement that was executed by Mr. Trudeau was virtually identical to the version that was executed by Mr. Benson and contains the same material provisions that are described in paragraphs 72-78 above.

89.　On or about September 14, 2018, Mr. Trudeau resigned his position with AnnieMac and soon thereafter began working as a Mortgage Loan Originator for Gold Star.

90.　Prior to informing AnnieMac if his intent to resign, Mr. Trudeau entered into an Agreement with the other Employee Defendants to divert AnnieMac customers to Gold Star.

91.　In preparation for his resignation from the AnnieMac, and in furtherance of his agreement with the other Employee Defendants, Mr. Trudeau took steps to email himself customer information including specific contact and financial information.

92.　In the days leading up to his separation with the AnnieMac, Mr. Trudeau forwarded emails from his AnnieMac work email to his personal email account containing information about specific AnnieMac customers.

93.　Moreover, after the date of his resignation, Mr. Trudeau continued to solicit customers of AnnieMac.  On September 19 and September 20, Mr. Trudeau continued to solicit and work with Lisa Hackett, a customer of AnnieMac.

18

94.     On or about October 1, 2018, Mr. Trudeau began working for Gold Star.

95.     Mr. Trudeau's conduct leading up to his resignation, and immediately following, violated the obligations imposed upon him by the Loan Originator Agreement, common law, and statute.

96.     Upon information and belief, Mr. Trudeau emailed customer information to his personal email account for the purposes of soliciting AnnieMac customers after he left the company.  This conduct was done for his own personal benefit and for the benefit of Gold Star.

**Jim Schaefer**

97.     Jim Schaefer was hired by AnnieMac as an Mortgage Loan Originator on or about December 26, 2017.

98.     As a condition of his employment with AnnieMac, Mr. Schaefer signed the Loan Originator Agreement, a copy of which is attached hereto as **Exhibit 5**.

99.     The Loan Originator Agreement that was executed by Mr. Schaefer was virtually identical to the version that was executed by Messrs. Benson and Trudeau.  It contains the same material provisions that are described in paragraphs 72-78 above.

100.    On or about September 27, 2018 Mr. Schaefer resigned his position with AnnieMac.

101.    Prior to informing AnnieMac if his intent to resign, Mr. Schaefer entered into an Agreement with the other Employee Defendants to divert AnnieMac customers to Gold Star.

102.    In preparation for his resignation from the AnnieMac, and in furtherance of his agreement with the other Employee Defendants, Mr. Schaefer took steps to email himself customer information including specific contact and financial information.

103.    On or about September 14, 2018, Mr. Schaefer used his AnnieMac email account to send himself Confidential Material, contact information, and financial information about AnnieMac customers and potential customers.  Upon information and belief, the customers and potential customers Mr. Schaefer emailed himself about include:

      a.   Scott Cobb
      b.   Anna Hegdahl
      c.   Ben Brooks
      d.   Betsy Gabler
      e.   Kristie Iverson
      f.   Kelly Theis
      g.   Brian Klaasmeyer
      h.   Levi Giwa
      i.   Carrie Ingalls
      j.   Daniel Vasterling
      k.   Dave Trigo
      l.   Dave Hellmuth
      m.  Dave Clifford Erik Heieie
      n.   Ezekiel Okeleye
      o.   Hannah Sung

104.    Similarly, on September 17, 2018, Mr. Schaefer again used his AnnieMac email account to send himself Confidential Material, contact information, and financial information about AnnieMac customers and potential customers.  Upon information and belief, the customers and potential customers Mr. Schaefer emailed himself about include:

      p.   Heather & Simon Dawson
      q.   Jason Drowler
      r.   Jess Shaver
      s.   Siara Elovich
      t.   Joey Bishop
      u.   John Hand
      v.   Johnathan Paphatsalang
      w.   Jose Gomez
      x.   Kari Lundin
      y.   Katie Zupan
      z.   Kim Lambert
      aa.  Cheryl Moore
      bb.  Larry Martinez
      cc.  Laurence Mustful

dd. Lisa Hager
ee. Lisa Ailes
ff.  Marilyn Salman
gg. David Poulard
hh. Megan Wicker
ii.   Michael McGregor
jj.   Jim & Melissa Steward
kk. Melanie Magee
ll.   Ralf Williams
mm.Jim Miller
nn. Mike Zupan
oo. Erik Norberg
pp. Norm Oppegard
qq. Peter Mosemann
rr.  Dick Anderson
ss.  Ryan Voiles
tt.   Samantha & Joshua Carter
uu. Samantha Moore
vv. Sherita Scott-Kelley
ww. Dou Lee
xx. Larry Reeves
yy. Tara Jimenez
zz.  Tracey Gamlen
aaa. Willie Greene
bbb. Kevin Zee

105.    On or about September 26, 2018, Mr. Schaefer sent a mass email to numerous AnnieMac customers informing them of his move to Gold Star and asking them to update their address books with his new contact information.

106.    On or about October 1, 2018, Mr. Schaefer began working for Gold Star as a loan originator.

107.    Mr. Schaefer's conduct leading up to his resignation, and immediately following, violated the obligations imposed upon him by the Loan Originator Agreement, common law, and statute.

108.    Mr. Schaefer's conduct was done in furtherance of his agreement with the Employee Defendants, for his own personal benefit, and for the benefit of Gold Star.

109.     Upon information and belief, Mr. Schaefer emailed customer information to his personal email account for the purposes of soliciting AnnieMac customers after he left the company.

110.     The collective conduct of the Defendants was done willfully, intentionally, with malice, and with the intent to cause serious economic injury to AnnieMac.

111.     The Defendants' conduct was done for the purpose of diverting customers from AnnieMac to Defendants' new employer Gold Star.

<u>**COUNT I**</u>
Breach of Contract
(Against Joshua Lund)

112.     Plaintiff re-alleges and incorporates herein the allegations contained in paragraphs 1 – 111 of this Complaint as if set forth fully herein.

113.     Mr. Lund agreed to with Plaintiff that he would return his Retention Bonus if he failed to work for Plaintiff for twelve months.

114.     Mr. Lund failed to work for Plaintiff for twelve months and thus breached is agreement with the Plaintiff.

115.     AnnieMac has been damaged as a direct and proximate result of Lund's breach.

<u>**COUNT II**</u>
Unjust Enrichment
(Against Joshua Lund)

116.     Plaintiff re-alleges and incorporates herein the allegations contained in paragraphs 1 – 115 of this Complaint as if set forth fully herein.

117.     Mr. Lund received a benefit from the Plaintiff in the form of a Retention Bonus.

118.     Plaintiff expected that Mr. Lund would remain employed with the company for twelve months in exchange for the Retention Bonus.

119.    Mr. Lund voluntarily terminated his employment with Plaintiff prior to the expiration of the twelve-month period, but after he received his full Retention Bonus.

120.    Mr. Lund has been unjustly enriched by his keeping of the Retention Bonus and Plaintiff has been damaged.

### COUNT III
(Breach of Contract)
All Employee Defendants

121.    Plaintiff re-alleges and incorporates herein the allegations contained in paragraphs 1 – 111 of this Complaint as if set forth fully herein.

122.    Each Employee Defendant individually entered into an agreement with AnnieMac which contained restrictions on the use of Confidential Materials both during and after their respective employment.

123.    Each Employee Defendant individually entered into an agreement with AnnieMac which contained restrictions on the Employee Defendants' ability to solicit AnnieMac customers and potential customers after the termination of their employment.

124.    Each Employee Defendant individually entered into an agreement with AnnieMac which contained restrictions on the Employee Defendants' ability to solicit other AnnieMac employees.

125.    Each Employee Defendant breached their respective agreements with AnnieMac by improperly removing Confidential Materials from AnnieMac prior to their termination, and in anticipation of accepting employment with a competitor.

126.    Each Employee Defendant breach their respective agreements with AnnieMac by taking customer contact information and financial information and by using that information to

solicit AnnieMac's customers after the termination of their employment.  This conduct was done for the Employee Defendants' own benefit and for the benefit of their new employer Gold Star.

127.   Each Employee Defendant breach their respective agreements with AnnieMac by engaging in the solicitation of other AnnieMac employees.

128.   As a result of the Employee Defendants' breach of their respective agreements, AnnieMac has suffered damages and irreparable harm including loss profits, loss of good will, and loss customers.

129.   These damages will continue unless the Employee Defendants are permanently enjoined from further violations.

## COUNT IV
Misappropriation of Trade Secrets in Violation of the Minnesota Uniform Trade Secrets Act,
Minn. Stat. § 325C.01 *et seq.*
(against Defendants Benson, Trudeau, and Schaefer)

130.   Plaintiff re-alleges and incorporates herein the allegations contained in paragraphs 1 – 111 and 121-129 of this Complaint as if set forth fully herein.

131.   AnnieMac derives independent economic value from its prospective and current customer lists, customer information, loan application and origination templates, agreements and compensation, pricing information, and communications with clients. As such, they constitute trade secrets under Minnesota's Uniform Trade Secrets Act.

132.   Messrs. Benson, Trudeau, and Schaefer were entrusted with this confidential and proprietary information in the performance of their jobs as a Mortgage Loan Originators.

133.   Messrs. Benson, Trudeau, and Schaefer improperly and unlawfully accessed and acquired these trade secrets by emailing this information to their personal email addresses prior to separating their employment with AnnieMac. Messrs. Benson, Trudeau, and Schaefer took such action with knowledge of the impropriety of their acquisition and are now utilizing such trade

secrets in breach of applicable fiduciary duty of loyalty. This conduct was done with the knowledge that it is detrimental to AnnieMac.

134.    As a direct result of the actions by Messrs. Benson, Trudeau, and Schaefer, AnnieMac has been harmed and continues to be irreparably harmed.

135.    The damage AnnieMac has suffered consists of lost customers and good will.

136.    These damages will continue unless Messrs. Benson, Trudeau, and Schaefer are permanently enjoined from further violations.

**<u>COUNT V</u>**
Misappropriation of Trade Secrets in Violation of the New Jersey Trade Secrets Act,
N.J.S.A. § 56:15-1 et seq.
(against Defendant Lund)

137.    Plaintiff re-alleges and incorporates herein the allegations contained in paragraphs 1 – 111 and 121-129 of this Complaint as if set forth fully herein.

138.    AnnieMac derives independent economic value from its prospective and current customer lists, customer information, loan application and origination templates, agreements and compensation, pricing information, and communications with clients. As such, they constitute trade secrets under New Jersey Trade Secrets Act.

139.    Mr. Lund was entrusted with this confidential and proprietary information in the performance of his jobs as a branch manager.

140.    Mr. Lund improperly and unlawfully accessed and acquired these trade secrets by emailing this information to his personal email address prior to separating his employment with AnnieMac. Mr. Lund took such action with knowledge of the impropriety of his acquisition of the Confidential Material and is now utilizing such trade secrets in breach of applicable fiduciary duty of loyalty. This conduct was done with the knowledge that it is detrimental to AnnieMac.

141.    As a direct result of the actions by Mr. Lund, AnnieMac has been harmed and continues to be irreparably harmed.

142.    The damage AnnieMac has suffered consists of lost customers and good will.

143.    These damages will continue unless Mr. Lund are permanently enjoined from further violations.

### COUNT VI
Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*
(against all Defendants)

144.    Plaintiff re-alleges and incorporates herein the allegations contained in paragraphs 1 – 111 and 121-143 of this Complaint as if set forth fully herein.

145.    The Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1839(3), defines a trade secret as, inter alia, "all forms and types of financial, business, scientific, technical, economic, or engineering information, . . . whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing" – provided that the owner took "reasonable measures to keep such information secret," and it offers the holder of the trade secret an advantage over competitors who do not know or use the trade secret.

146.    AnnieMac's realtor database, nonpublic borrower financial and personal information, prospective and current customer information, loan application and loan life cycle template forms, and communications with clients constitute trade secrets.

147.    AnnieMac's trade secrets are related to products or services used in interstate commerce.

148.    Employee Defendants were entrusted with this confidential and proprietary information in the performance of her job.

149.    Employee Defendants improperly and unlawfully accessed and acquired these trade secrets with knowledge of the impropriety of their acquisition and are utilizing such trade secrets.

150.    Upon information and belief, Gold Star was aware that the Employee Defendants improperly and unlawfully obtained AnnieMac's trade secrets and knew that these trade secrets were being used for Gold Star's benefit.

151.    Defendants utilized such trade secrets without AnnieMac's express or implied consent, all to AnnieMac's detriment.

152.    As a direct result of Defendants' actions, AnnieMac has been harmed and continues to be irreparably harmed.

153.    Defendants have caused AnnieMac damages through lost customers and good will and will continue to violate AnnieMac's rights by using its Confidential Information for Defendants' benefit unless they are permanently restrained.

## COUNT VII
Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.*
(against all Defendants)

154.    Plaintiff re-alleges and incorporates herein the allegations contained in paragraphs 1 – 111 and 121-153 of this Complaint as if set forth fully herein.

155.    The Computer Fraud and Abuse Act ("CFAA") 18 U.S.C. § 1030(a)(2), provides for punishment for one who "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains information contained in a financial record of a financial institution," or "information from any protected computer." *18 U.S.C.S. § 1030(a)(2)(A) and (C).*

156.    AnnieMac qualifies as a financial institution under the CFAA.

157.    The information misappropriated by the Defendants, as described above, constitutes "financial records" under the CFAA.

27

158.    AnnieMac's computers, used by the Employee Defendants when misappropriating the above described information, are "protected computers" under the CFAA.

159.    Employee Defendants exceeded their authorized access to AnnieMac's protected computers by using the same to misappropriate confidential financial records, as described above.

160.    This conduct violates the CFAA.

161.    As a direct result of the Defendants' actions, AnnieMac has been harmed and continues to be irreparably harmed.

162.    Defendants have caused AnnieMac damages in excess of $200,000 through lost customers and good will and will continue to violate AnnieMac's rights by using the financial records misappropriated from its protected computers, unless they are permanently restrained.

## COUNT VIII
### Common Law Breach of Fiduciary Duty
### (Against Employee Defendants)

163.    Plaintiff re-alleges and incorporates herein the allegations contained in paragraphs 1 – 111 and 121-162 of this Complaint as if set forth fully herein.

164.    As an employee of AnnieMac, and pursuant to each of the Employee Defendants' respective employment agreements, each owed the following fiduciary duties to AnnieMac:

a.  A duty to faithfully perform their duties, using their best efforts solely for AnnieMac's advancement, during the term of her employment and not to engage in any other similar work for competing entities;

b.  A duty not to disclose or utilize in any manner AnnieMac's Confidential Information for their own benefit and the benefit of others, or to the detriment of AnnieMac;

28

    c.   A duty not to misuse AnnieMac's Confidential Information except for the express purpose for which the information was provided to them; and

    d.   A duty of good faith and loyalty to AnnieMac.

165.    Each of the Employee Defendants breach these duties by removing Confidential Materials about AnnieMac customers for the sole purpose of soliciting those customers on behalf of a competitor.

166.    Each of the Employee Defendants breach these duties by spending collecting information about AnnieMac's customers for a competitor, instead of focusing on AnnieMac business.

167.    These actions were orchestrated and undertaken by the Employee Defendants while they were still employees of AnnieMac and owed fiduciary duties of loyalty and fair dealing to AnnieMac.

168.    As a result of the Employee Defendants' multiple willful breaches of her fiduciary duties, AnnieMac has suffered and will continue to suffer damages.

### COUNT IX
Common Law Civil Conspiracy
(Against All Defendants)

169.    Plaintiff re-alleges and incorporates herein the allegations contained in paragraphs 1 – 111 and 121-168 of this Complaint as if set forth fully herein.

170.    Defendants, by their aforesaid unlawful actions, agreed to conspire and act in concert to harm AnnieMac by engaging in unlawful conduct without justification.

171.    Defendants intended to misappropriate and did misappropriate AnnieMac's Confidential Information by having the Employee Defendants transfer such information to their

personal email addresses, and subsequently used it in their position with Gold Star in violation of federal and state law.

172.     Defendants took acts in furtherance of this misappropriation by removing information from the Employee Defendants' company emails and transferring it to, or assisting and/or encouraging the transfer to, their personal email accounts, and ultimately to Gold Star's company computers.

173.     Defendants have used and continue to use this information to the detriment of AnnieMac and to benefit themselves and Gold Star's business.

174.     As a direct result of this conspiracy, AnnieMac has been harmed and continues to be harmed by the loss of specific loans, general business and goodwill in the marketplace.

## PRAYER FOR RELIEF

WHEREFORE, as to all counts, AnnieMac respectfully requests that the Court enter judgment in its favor and award the following relief against Defendants:

A. A permanent injunction thereafter restraining Defendants, their agents, employees, attorneys, and all others in concert or participation with any of them from maintaining, using, disclosing or disseminating any confidential and/or proprietary information of AnnieMac, including all such information the Defendants misappropriated from AnnieMac, was privy to or obtained knowledge of while employed and/or in any capacity providing services for or on behalf of AnnieMac;

B. An order requiring the return of all AnnieMac's Confidential Materials and/or Proprietary Information that Defendants transferred, copied or otherwise diverted to their personal email accounts or storage devices and/or to any system owned or operated by Gold Star;

30

C.  An order requiring the disgorgement of Defendants' profits that are the result of their

unlawful use of AnnieMac's Confidential Materials, in amounts to be proven through

expedited discovery, or at the latest at the trial of this matter;

D.  Such actual and nominal damages as may be proven as a result of Defendants'

wrongdoing;

E.  Interest;

F.  Costs;

G.  Statutory and contractual attorneys' fees; and

H.  Such other relief as the Court deems just and proper.

## RESERVATION OF RIGHT TO SEEK PUNITIVE DAMAGES

AnnieMac reserves the right to seek leave to amend the Complaint at the appropriate time

to plead a claim for punitive damages.

## DEMAND FOR JURY TRIAL

AnnieMac demands trial by jury on all issues so triable.


Dated:  June 10, 2019                          /s/  *Zachary Glaser*
                                               Zachary Glaser, Esquire
                                               Ten Penn Center
                                               1801 Market Street, Suite 2300
                                               Philadelphia, PA 19103
                                               (t) (267) 319-1300
                                               (f) (267) 338-1335
                                               zglaser@offitkurman.com
                                               *Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing Second Amended Complaint was served on June 10, 2019 upon counsel of record for Defendant Joshua Lund through CM/ECF and via Email:

> Peter Goodman, Esquire
> Law Office of Peter G. Goodman, PLLC
> 30 Broad Street, 37th Floor
> New York, NY 10004
> *peter@goodmanpllc.com*

> /s/  *Zachary Glaser*
>   Zachary Glaser

4811-7305-0774, v. 3

32